FILED

2016 MAY 11 AM 9:3

**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

UNITED STATES OF AMERICA and STATE OF FLORIDA, *ex rel.* GAILE-JEAN NOEL, a Florida resident, and ASHER WILLIAMS, LLC, a foreign limited liability corporation,

Plaintiffs,

- against -

ANTHONY THOMAS, a Florida resident, a/k/a ANTHONY SASSO, a Florida resident, WIL SLAGLE, a Florida resident, DAVID C. HUGHES, M.D., a Rhode Island resident, JACK H. STAPLETON, a Florida resident, JACK L. STAPLETON, a Florida resident, MEDI-DIRECT, LLC a Delaware corporation, PATCHWERX LABS, NORTH AMERICA, a foreign corporation, PATCHWERX LABS, INC., a foreign corporation, MCLINICIAN, LLC, a foreign corporation, PHUSION MARKETING GROUP INC., a Florida corporation, PHUSION RX, a foreign corporation, FLORIDA PHARMACY SOLUTIONS, a Florida corporation, DIRECT PHARMACY SERVICES, LLC, a Florida corporation, C.V. MCDOWELL, LLC, a Florida limited liability corporation, and MCDOWELL COMPANIES, INC., a Florida corporation,

Defendants.

Case No.: 8:15-cv-2837-T-30JSS

**FIRST AMENDED COMPLAINT**

**FILED *IN CAMERA* AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)**

Plaintiffs the United States of America and the State of Florida, *ex rel.* Gaile-Jean Noel and Asher Williams, LLC, by and through their attorneys, Audrey Hildes Schechter, Attorney at Law, allege for their amended complaint as follows:

## PRELIMINARY STATEMENT AND NATURE OF THE ACTION

1) This is a civil action brought by co-relators Gaile-Jean Noel and Asher Williams, LLC ("Relators") on their own behalf and on behalf of the United States of America ("United

States") and the State of Florida against Anthony Thomas, a/k/a Anthony Sasso, Wil Slagle, David C. Hughes, M.D., Jack H. Stapleton, Jack L. Stapleton, Medi-Direct, LLC, Patchwerx Labs, North America, and Patchwerx Labs, Inc., Mclinician, LLC, Phusion Marketing Group, Inc. ("Telemarketer"), Phusion RX, Florida Pharmacy Solutions, Direct Pharmacy Services, LLC, McDowell Companies, Inc., C.V. and McDowell Medical LLC under the False Claims Act, 31 U.S.C. §§ 3729 *et seq.* (the "FCA"), and the Florida False Claims Act, Florida §§ 68.081 *et seq.*, (the "Florida False Claims Act"), to recover damages sustained by, and penalties owed to, the United States and the State of Florida as the result of Defendants having knowingly presented or caused to be presented or conspired to present, to the United States and the State of Florida, false claims for the payment of funds disbursed under the Medicare Program, 42 U.S.C. §§ 1395c-1395i-4, the Medicaid Program, 42 U.S.C. §§ 1396 *et seq.*, and federally-funded health insurance programs, including TRICARE/CHAMPUS, 32 C.F.R. §199, *et seq.*, in excess of the amounts to which Defendant was lawfully entitled.

2) These claims are based on Defendants' multi-level kickback scheme to profit from prescriptions procured through a telemarketing onslaught, targeting the elderly and United States Veterans, and the submission of, and conspiracy to submit, false and fraudulent patient claims to the United States and the State of Florida in order to obtain payments for various compound pain creams and skin creams at huge profit. This scheme costs the United States Government considerable money, and also harms the medical consumer.

3) The pain and skin creams involved include, but are not limited to, those bearing NDC number 69329-0250-01 ("Dermasilk Rx SDS Pak", hereinafter, the "Skin Cream"), NDC number 69329-310-00 (Derma Silk Rx Anodynexa Pak) and NDC number 69329-335-00 (DicloPak)(collectively, the "Pain Cream") (all three, collectively "DermaSilkRx Product

Line"), as well as some other pain creams, including, but not limited to, NDC number 59088-0336-00 (Silipak), NDC number 59088-0353-00 (Silipak 2/Pharma), NDC numbers 59088-0062-00 (InflammaPak), 59088-0343-00 (Lexitrol) and NDC number 59088-0954 (Purefolix), NDC number 75840-093-01 (SanaDermRx), NDC number 59088-0343-00 (Lexitral PharmaPak)), or combinations of those pain creams, for instance: NDC number 0116-1061-08, 30707387763634, 59088-333-08, 59088-334-00 (DermacinRx Surgical Combo Pak), NDC numbers 16571-201-06, 53746-253-60, 59088-062-00, 59088-310-16 (DermacinRx Inflammatral Pak), NDC numbers 30707387763634, 59088-333-08, 59088-336-00, 67877-251-80 (DermacinRx Silapak) (collectively, "non-DermaSilkRx Products"). Defendants have operated in this manner, under these particular entities, since at least July, 2015 through the present.

## JURISDICTION AND VENUE

4) Under 31 U.S.C § 3730(e), there has been no statutorily relevant public disclosure of the "allegations or transaction" in this Complaint.

5) This court has personal jurisdiction over the Defendants because, among other things, Defendants transact business in this District, and engage in wrongdoing in this District.

6) Venue lies in this District pursuant to 31 U.S.C. § 3732(a), and 28 U.S.C. §§ 1391(b) and 1391(c), because Defendants do business in this District, and because many of the acts complained of herein took and continue to take place in this District.

## THE PARTIES

7) Plaintiffs are the United States of America on behalf of its agencies the United States Department of Health and Human Services ("HHS") and the Department of Defense ("DOD"), the State of Florida on behalf of its agency the Department of Health ("DOH"), and

Gaile-Jean Noel, a Florida resident, and Asher Williams, LLC, a foreign limited liability corporation (collectively, "Relators"),

8) Relator Gaile-Jean Noel, a Florida resident, works in the pharmaceutical field, and is an original source of the allegations in this Amended Complaint and the allegations in the Amended Complaint are not based upon publicly disclosed information. Relator has voluntarily provided the government with information prior to the filing of the initial Complaint in accordance with 31 U.S.C § 3730(b) (2).

9) Relator Asher Williams, LLC is a limited liability corporation with one member. That individual is linked to the pharmaceutical field, and is an original source of the allegations in this Amended Complaint and the allegations in the Amended Complaint are not based upon publicly disclosed information. Relator has voluntarily provided the government with information prior to the filing of the initial Complaint in accordance with 31 U.S.C § 3730(b) (2).

10) Defendant Anthony Thomas, a/k/a Anthony Sasso (Defendant "Thomas") is a Florida resident with ties to several of the Defendant companies set forth herein, including Mclinician (CEO), and Phusion Marketing Group (CMO). Thomas has used several Defendant entities to engage in the wrongful and fraudulent behavior.

11) Defendant Wil Slagle (Defendant "Slagle) is a Florida resident, with ties to several of the Defendant companies set forth herein, including Medi-Direct (CEO), and Florida Pharmacy Solutions (CEO). Slagle has used several Defendant entities to engage in the wrongful and fraudulent behavior.

12) Upon information and belief, Defendant David C. Hughes, M.D. (Defendant "Hughes") is a resident of Rhode Island. Hughes has used several Defendant entities set forth herein, including Phusion Rx and Mclinician, to engage in the wrongful and fraudulent behavior.

13) Defendant Jack L. Stapleton is a Florida resident. Stapleton uses numerous Defendant entities, including Direct Pharmacy Services, LLC, C.V. McDowell, LLC, McDowell Companies, Inc. and CV McDowell Medical, Inc. (collectively, the "Stapleton Entities") to engage in the wrongful behavior.

14) Defendant Jack H. Stapleton is a Florida resident. Stapleton uses numerous Defendant entities, including, but not limited to, C.V. McDowell, and McDowell Companies, Inc. to engage in the wrongful and fraudulent behavior.

15) Defendant Patchwerx Labs, North America and Defendant Patchwerx Labs, Inc. (collectively, "Defendant Manufacturers" "Patchwerx Labs") are Arizona corporations, with their principal places of business located at 1351 S. Clearview Ave., Mesa, Arizona 85209. They are the manufacturers of the DermaSilkRx Product Line.

16) Defendant Medi-Direct, LLC ("Defendant Medi-Direct" or "Defendant Distributor and Marketer") is a foreign limited liability company, organized in the State of Delaware and authorized to transact business in Florida. It lists its principal business address as 5501 N 13th Avenue, Deerfield Beach, Florida 33442, and its Chief Executive Officer as Defendant Wil Slagle. As the sole exclusive marketing group for Defendant Patchwerx Labs, Medi-Direct engages in an extensive and aggressive marketing scheme in order to disseminate Patchwerx's drugs, including the DermaSilkRx Product Line, into the marketplace. Defendant Medi-Direct is the umbrella entity under which Defendant Slagle operates several of the other Defendant entities.

17) Defendant Mclinician, LLC is a Delaware limited liability company, doing business throughout the State of Florida, and its primary practice address is 5051 NW 13TH Avenue, Pompano Beach, Florida 33064, and its primary mailing address is 118 Carrs Trail, Greene, Rhode Island 02827-1808. Mclinician operates a network of telemedicine physicians, including those prescribing the DermaSilkRx Product Line, among other drugs. Mclinician LLC's CEO and President is Defendant David C. Hughes, M.D. Mclinician uses NPI #1770959611. Defendant Thomas is also an officer of Mclinician, and uses Dr. Hughes' NPI number in Mclinician's business dealings.

18) Defendant Phusion Marketing Group, Inc. ("Phusion MG") is a Florida corporation, with its principal place of business listed as 5051 NW 13th Avenue, Suite H, Pompano Beach, Florida 33064. Defendant Anthony Thomas is listed as its registered agent. Phusion MG supplies some of the prospective "patient" lists to telemarketers to further the scheme.

19) Defendant Phusion Rx is a foreign corporation, doing business throughout the State of Florida, and its primary practice address is 42 Ladd Street, Unit #208, East Greenwich, Rhode Island 02818-4361. Phusion Rx operates a compounding pharmacy, and promotes its business model as collaborative relationships with small pharmacies throughout the country. Through the collaboration, it boasts the ability to provide the smaller pharmacies with access to compound drugs otherwise unavailable. Phusion Rx's authorized CEO and President is Dr. David C. Hughes, and Phusion Rx uses NPI # 1215353586.

20) Defendant Florida Pharmacy Solutions is a Florida corporation with its principal place of business in Zephyrhills, Florida. It serves as a pharmaceutical distribution center for the DermaSilkRx Product Line, and other drugs, distributing drugs throughout the State and the

country. Florida Pharmacy Solutions promotes the DermaSilkRx Product Line to various call centers to drive qualified patients to their pharmacy for fulfillment. In order to entice the call centers, Florida Pharmacy Solutions has obtained one NDC number to cover numerous components of the DermaSilkRx products. Needing approval for only one NDC greatly increases the chance for drug payment approval, rather than needing each separate component approved. Call centers enjoy increased revenues as a result of the eased processing, due to the increase in approved and paid prescriptions.

21) Defendant Direct Pharmacy Services, LLC is a Florida limited liability corporation, with its principal place of business in Fort Lauderdale, Florida ("Direct Pharmacy Services"). Jack L. Stapleton is its manager. Direct Pharmacy Services is involved in the fraudulent scheme set forth herein. In particular, Direct Pharmacy Services is a mail order pharmacy, through which diabetic medications and compound pain and skin creams are distributed to patients.

22) Defendant C.V. McDowell, LLC, is a Florida limited liability corporation with its principal place of business in Fort Lauderdale, Florida ("C.V. McDowell"). Jack L. Stapleton is its manager and Jack Stapleton is an authorized member. C.V. McDowell is involved in the fraudulent scheme set forth herein. C.V. McDowell is the umbrella entity for the Stapleton Entities. The main business of this group of entities is soliciting prescriptions for, and selling diabetic supplies. Additionally, they deal in compound pain and skin creams.

23) Defendant McDowell Companies, Inc. is a Florida corporation, with its principal place of business in Fort Lauderdale, Florida. ("McDowell Companies"). Jack L. Stapleton is its President. McDowell Companies is involved in the fraudulent scheme set forth herein.

McDowell Companies' main business is soliciting prescriptions for, and selling diabetic supplies and compounded pain and skin creams.

24) The Stapleton Entities are medical marketing and pharmaceutical companies, handling a range of different aspects of medical marketing, from developing leads to running call centers, to providing compounding ingredients to compounding pharmacies, running a mail order pharmaceutical facility and prescription benefits services center. They also provide call leads to other entities in the medical and pharmaceutical injuries. Some or all of the entities use an "Opt in Survey" technique, which technique Defendants Thomas, Slagle and their entities likewise adopted. The Stapleton Entities also share their technique and call lists with clients who can benefit from the same approach, including other Defendants in this lawsuit. The Stapleton Entities have a patient database of approximately seven million people.

## THE LAW

### Federal False Claims Act

25) The FCA provides, in pertinent part, that:

(1) [A]ny person who –

> (A) knowingly presents, or causes to be presented a false or fraudulent claim for payment or approval;
>
> (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; or
>
> . . .
>
> (G) knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government,

is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted . . . plus 3 times the amount of damages which the Government sustains because of the act of that person.

31 U.S.C. § 3729. *See also* Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. § 2461 note); Pub. Law 104-410; 64 Fed. Reg. 47,099 (1999).

26) Fraud is knowingly and willfully executing, or attempting to execute, a scheme or artifice to defraud any health care benefit program or to obtain (by means of false or fraudulent pretenses, representations, or promises) any of the money or property owned by, or under the custody or control of, any health care benefit program. 18 U.S.C. § 1347.

27) The term "knowingly" means that a person "(1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A). Thus, "no proof of specific intent to defraud is required" to impose liability under the False Claims Act. 31 U.S.C. § 3729(b)(1)(B).

28) The FCA also broadly defines a "claim" as "any request or demand, whether under a contract or otherwise, for money or property which is made to a contractor, grantee, or other recipient if the United States Government provides any portion of the money or property which is requested or demanded, or if the Government will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded." 31 U.S.C. § 3729(b)(2).

29) The FCA empowers private persons having information regarding a false or fraudulent claim against the Government to bring an action on behalf of the Government and to share in any recovery. The complaint must be filed under seal without service on any Defendants. The complaint remains under seal while the Government conducts an investigation of the allegations in the complaint and determines whether to intervene in the action. 31 U.S.C. § 3730(b).

30) False certifications constitute false claims under the FCA.

**The FCA's Relationship to the Anti-Kickback Statute**

31) A violation of the Anti-Kickback Statute ("AKS"), 42 U.S.C. § 1320a-7b (b), in connection with a claim submitted to the Government for payment is actionable under the FCA.

32) The AKS reflects Congress' concern that payments to those who influence healthcare decisions will result in providing goods and services that are medically unnecessary, of poor quality, or even harmful to a vulnerable patient population. To protect the integrity of government-funded healthcare programs from these difficult to detect harms, Congress enacted a *per se* prohibition against the payment of kickbacks in any form, regardless of whether the particular kickback gave rise to overutilization or poor quality of care.

33) The AKS prohibits any person or entity from making or accepting payment to induce or reward any person for referring, recommending, or arranging for federally funded medical services, including services provided under the Medicare, Medicaid, and TRICARE programs. 42 U.S.C. § 1320a-7b (b).

34) The AKS makes it a crime to knowingly and willfully offer, pay, solicit, or receive any remuneration to induce a person—

> (1) to refer an individual to a person for the furnishing of any item or service covered under a federal healthcare program; or
>
> (2) to purchase, lease, order, arrange for or recommend any good, facility, service, or item covered under a federal healthcare program.

35) Thus, a relator states a viable FCA violation based on kickback claims in contravention of the AKS, if he or she shows that the defendant: 1) knowingly and willfully; 2) offered or paid remuneration; 3) to induce another to purchase a good or service; 4) for which payment may be made by a federal healthcare program. 42 U.S.C. § 1320a-7b(b)(2)(B).

36) Claims influenced by kickbacks are false because compliance with the Anti-Kickback Statute is a precondition of Medicare payment, such that liability under the FCA can be predicated on a violation of the Anti-Kickback Statute.

37) The term "any remuneration" encompasses any kickback, bribe, or rebate, direct or indirect, overt or covert, in cash or in kind. 42 U.S.C. § 1320a-7b (b) (1).

38) The financial relationships that exist between physicians, pharmacies and pharmaceutical manufacturers may be subject to the Anti-Kickback Statute. Medicare Prescription Drug Benefit Manual, Chapter 1, §40.

39) Parties who contract or subcontract with the Federal Government are subject to the Anti-Kickback Act which makes it unlawful "to provide, attempt to provide, or offer to provide any kickback." The Act defines "kickback" as:

> any money, fee, commission, credit, gift, gratuity, thing of value, or compensation of any kind which is provided, directly or indirectly, to any prime contractor, prime contractor employee, subcontractor, or subcontractor employee for the purpose of improperly obtaining or rewarding favorable treatment in connection with a prime contractor in connection with a subcontract relating to a prime contract.
> 41 U.S.C. §§52(2).

**The Medicare Program.**

40) Medicare is a federal government-funded medical assistance program, primarily benefitting the elderly and the disabled, which was established in 1965 by Title XVIII of the Social Security Act. *See* 42 U.S.C. §§ 1395 *et seq.* Medicare is administered by the federal Centers for Medicare and Medicaid Services ("CMS"), and formerly known as the Health Care Financing Administration ("HCFA"), which is a division of the U.S. Department of Health and Human Services ("HHS").

41) In December 2003, Congress passed the Medicare Prescription Drug Benefit, Improvement and Modernization Act ("MMA"), which provides voluntary coverage to eligible individuals for outpatient prescription drugs under the Medicare Part D benefit. *See* 42 U.S.C. §§ 1395w-101 through 1395w-152; 42 C.F.R. Part 423.

42) Only those drugs prescribed for a "medically necessary" and "medically accepted indication" are covered under Part D. 42 U.S.C. § 1395w-102(e)(1); 42 C.F.R. § 423.100; *Medicare Prescription Drug Benefit Manual*, ch. 6, § 10.6.

**Medicare Part D Coverage Stages.**

43) The Medicare Part D program is separated into coverage stages and the costs to the Part D beneficiary and Medicare varies greatly depending on which stage of the plan the beneficiary finds him or herself. The stage of coverage depends on the amount of true out-of-pocket ("TrOOP") spending the beneficiary has incurred on prescription medication. As a Part D beneficiary progresses through different stages of coverage, the cost sharing between the Part D beneficiary and Medicare Part D greatly varies.

44) Once a Part D beneficiary has paid a total TrOOP of $3,280, the beneficiary moves to Stage Three. In Stage Three, the beneficiary is responsible for 100% of the cost of prescription drugs until the beneficiary has paid $1,420 during this Stage (or a total TrOOP of $4,700). Stage Three is referred to as the Coverage Gap, and colloquially, is often referred to as the "Donut Hole."

45) Stage Four is reached when TrOOP spending on prescription medications has reached $4,700. Stage Four is referred to as Catastrophic Coverage. Coverage by the plan resumes in Stage Four with the beneficiary typically paying 5% and the plan paying 95% for the remainder of the calendar year for an unlimited amount of prescription medications. There is no cap on the amount of coverage a beneficiary can receive under Catastrophic Coverage until the end of the calendar year.

46) "The financial relationships that exist between or among PDP [prescription drug plan] sponsors[1], health care professionals (including physicians and pharmacists), or pharmaceutical manufacturers may be subject to the Federal anti-kickback statute and, if the relationship involves a physician, the physician self-referral statute." Medicare Prescription Drug Benefit Manual, Chapter 1, §40.

47) "Medically necessary" prescription drugs are those drugs that are needed to evaluate, diagnose or treat an illness, injury, disease or its symptoms, and that meet the generally accepted standards of good medical practice. https://www.medicare.gov/part-d/coverage/rules/drug-plan-coverage-rules.html#1357. The prescription of medically unnecessary drugs may constitute fraud and abuse of the Medicare Part D program. *Medicare Prescription Drug Benefit Manual*, ch. 9, § 20.

48) The cost of the prescription drugs used impacts the beneficiaries' cost of the Part D policy (in premium and copayment). https://medicare.com/medicare-part-d/part-d-prescription-drug-coverage.

**Medicare Copayment.**

49) Under Part B, Medicare generally pays 80 percent of the reasonable charges (as established by the Medicare Physician Fee Schedule) for medically necessary services provided to beneficiaries. See 42 U.S.C. §§ 1395l(a)(1), 1395y(a)(1)(A). Medicare beneficiaries are generally expected to pay the remaining 20 percent in the form of a copayment, also called a "copay" or "coinsurance" payment.

[1] "Prescription drug plan or PDP: Prescription drug coverage that is offered under a policy, contract, or plan that has been approved as specified in 42 CFR 423.272 and that is offered by a PDP sponsor that has a contract with CMS that meets the contract requirements under subpart K of 42 CFR 423." Medicare Prescription Drug Benefit Manual, Chapter 1, §20. "PDP sponsor: A nongovernmental entity that is certified under 42 CFR Part 423 as meeting the requirements and standards of 42 CFR Part 423 that apply to entities that offer prescription drug plans." *Id.*

50) The copayment is intended to minimize costs to federal healthcare programs and beneficiaries by incentivizing beneficiaries to be better health care consumers—selecting services because they are medically needed, rather than simply because they are free. See HHS Office of Inspector General Special Fraud Alert, 59 Fed. Reg. 65372-01, at 65375 (Dec. 19, 1994). Consequently, federal law prohibits the routine waiver of copayments, and except in narrow circumstances, the non-routine waiver of copayments. *Id.* (citing 18 U.S.C. §§ 287, 1001; 31 U.S.C. § 3729; 42 C.F.R. §§ 1320a-7, 1320a-7a, 1320a-7b).

51) The routine waiver of copayments is prohibited, first, because "[a] provider, practitioner or supplier who routinely waives Medicare copayments . . . is misstating its actual charge." For example:

> [I]f a supplier claims that its charge for a piece of equipment is $100, but routinely waives the copayment, the actual charge is $80. Medicare should be paying 80 percent of $80 (or $64), rather than 80 percent of $100 (or $80). As a result of the supplier's misrepresentation, the Medicare program is paying $16 more than it should for this item.

Special Fraud Alert, 59 Fed. Reg. 65372-01, at 65374–75. As the Medicare Claims Processing Manual (Ch. 23 § 80.8.1) explains:

> Deductible and coinsurance amounts are taken into account (included) in determining the reasonable charge for a service or item. In this regard, a billed amount that is not reasonably related to an expectation of payment is not considered the "actual" charge for the purpose of processing a claim or for the purpose of determining customary charges.

52) Second, the routine waiver of copayments may constitute impermissible remuneration under provisions of the Social Security Act, including the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), and the Civil Monetary Penalties Law, 42 U.S.C. § 1320a-7a. As the HHS Office of Inspector General explained:

> In certain cases, a provider, practitioner or supplier who routinely waives Medicare copayments . . . could be held liable under the Medicare and Medicaid

> anti-kickback statute. 42 U.S.C. 1320a-7b(b). The statute makes it illegal to offer, pay, solicit or receive anything of value as an inducement to generate business payable by Medicare or Medicaid. When providers, practitioners or suppliers forgive financial obligations for reasons other than genuine financial hardship of the particular patient, they may be unlawfully inducing that patient to purchase items or services from them.

Special Fraud Alert, 59 Fed. Reg. 65372-01, at 65375; see also Medicare Program Integrity Manual, Ch. 4 § 4.22.1.1 ("Routine waivers of coinsurance or deductibles are unlawful because they could result in . . . violation of the anti-kickback statute.").

53) Similarly, § 1128A(a)(5) of the Social Security Act prohibits the offer or transfer of "remuneration" to a Medicare beneficiary that the offeror or transferor knows or should know is likely to influence the beneficiary's healthcare decisions. 42 U.S.C. § 1320a-7a(a)(5); see also OIG Special Advisory Bulletin, Offering Gifts and Other Inducements to Beneficiaries (Aug. 30, 2002). Prohibited "remuneration" includes "the waiver of coinsurance and deductible amounts (or any part thereof)." 42 U.S.C. § 1320a- 7a(i)(6).

54) Even if non-routine, the waiver of a copayment is permissible only in narrow circumstances. The waiver must be (1) unadvertised, and must either (2) "address the special financial needs of a particular patient" or (3) occur after "a good faith effort to collect" has been exhausted. Special Fraud Alert, 59 Fed. Reg. 65372-01, at 65375; see also 42 U.S.C. § 1320a-7a(i)(6) (prohibited remuneration does not include "the waiver of coinsurance" if (i) "the waiver is not offered as part of any advertisement or solicitation;" (ii) "the person does not routinely waive coinsurance;" and (iii) the person determined "in good faith that the individual is in financial need" or failed to collect "after making reasonable collection efforts"); 42 C.F.R. § 1003.101 (same).

55) Copayment waivers are not permissible if they are advertised. Special Fraud Alert, 59 Fed. Reg. 65372-01, at 65375; 42 U.S.C. § 1320a-7a(i)(6); 42 C.F.R. § 1003.101.

Advertising includes indirect marketing or promotional efforts, or informal channels of information dissemination, such as "word of mouth" promotion by practitioners or patient support groups. OIG Special Advisory Bulletin, Offering Gifts and Other Inducements to Beneficiaries (Aug. 30, 2002). Suspect promotional efforts include statements like "Medicare Accepted As Payment in Full," "Insurance Accepted As Payment in Full," or "No Out-Of-Pocket Expense." Special Fraud Alert, 59 Fed. Reg. 65372-01, at 65375.

56) A copayment waiver based on financial hardship is prohibited if it is not supported by a "good faith" assessment of the individual beneficiary's financial need. Special Fraud Alert, 59 Fed. Reg. 65372-01, at 65375; 42 U.S.C. § 1320a-7a(i)(6); 42 C.F.R. § 1003.101. The "[r]outine use of 'Financial hardship' forms which state that the beneficiary is unable to pay the coinsurance" is insufficient. Special Fraud Alert, 59 Fed. Reg. 65372-01, at 65375. 75. A copayment waiver based on a failure to collect is prohibited if it is not preceded by a "good faith" collection effort. Special Fraud Alert, 59 Fed. Reg. 65372-01, at 65375; 42 U.S.C. § 1320a-7a(i)(6); 42 C.F.R. § 1003.101. The collection effort must be more than "token" and must be similar to efforts made to collect comparable amounts from non-Medicare patients. Medicare Claims Processing Manual, Ch. 23, § 80.8.1

**Medicaid.**

57) Medicaid is a joint federal-state program created in 1965 that provides health care benefits for eligible beneficiaries, primarily the poor and disabled. The federal portion of each state's Medicaid payments, known as the Federal Medical Assistance Percentage ("FMAP"), is based on the state's *per capita* income compared to the national average. *See* 42 U.S.C. § 1396d(b). Among the states, FMAP is at least 50 percent and is as high as 83 percent. The states pay the remaining portion of the cost to provide benefits under the Medicaid program.

58) At the Federal level, CMS administers Medicaid. Medicaid is used by 49 states, each of which has a State Medicaid agency to administer the program.

59) The states are permitted to expend Medicaid Funds to provide medical assistance for eligible persons for inpatient and outpatient prescription drugs. 42 U.S.C. §§ 1396a(10)(A); 1396d(a)(12).

60) The state Medicaid programs reimburse pharmacies for prescription drugs. Certain beneficiaries of the Medicaid program are also eligible for benefits under the Medicare program. These "dual-eligibles" are often elderly and poor persons who are residents of Long Term Care Facilities ("LTCFs"). Beginning in 2006, prescription drug benefits for dual-eligibles are processed through the Medicare Part D program. The Medicare program then charges state Medicaid programs for their respective shares of the cost to provide prescription drug benefits to dual-eligibles located within each state. These charges are referred to as the Medicaid Part D "clawback."

61) The Medicaid program reimburses only for "covered outpatient drugs" for which the drug manufacturer pays a rebate. 42 U.S.C. § 1396b(i)(10). The term "covered outpatient drug" requires use for a "medically accepted indication." 42 U.S.C. § 1396r-8(k)(3). A "medically accepted indication" includes only those FDA-approved, and those "off-label" uses that are "supported by one or more citations included or approved for inclusion in any of the compendia" listed in the statute. 42 U.S.C. § 1396r-8(k)(6); *see also* 42 U.S.C. § 1396r-8(g)(1)(B)(i) (identifying the compendia to be consulted). Medicare Prescription Drug Beneft Manual, Ch. 6, §10.6.

62) Florida regulations define "medically necessary" or "medical necessity" as: goods or services furnished or ordered must:

(a) Meet the following conditions:

1. Be necessary to protect life, to prevent significant illness or significant disability, or to alleviate severe pain;

2. Be individualized, specific, and consistent with symptoms or confirmed diagnosis of the illness or injury under treatment, and not in excess of the patient's needs;

3. Be consistent with generally accepted professional medical standards as determined by the Medicaid program, and not experimental or investigational;

4. Be reflective of the level of service that can be safely furnished, and for which no equally effective and more conservative or less costly treatment is available; statewide; and

5. Be furnished in a manner not primarily intended for the convenience of the recipient, the recipient's caretaker, or the provider.

Florida Admin Code §59G-1.010(166).

63) In order to submit claims to Medicaid, providers are required to sign a Certification Statement attesting that the care, services, or supplies for which claims to Medicaid are submitted were furnished "in accordance with applicable federal and state laws and regulations," including but not limited to the Federal and state Anti-Kickback Statutes. 42 U.S.C. § 1396, et seq.; Fla. Stat. § 409.907(1).

**Tricare.**

64) Another government-funded healthcare program is the Department of Defense's healthcare system, Tricare, which provides healthcare to almost 9.5 million beneficiaries worldwide—including active duty service members, National Guard and Reserve members, retirees, their families, survivors, certain former spouses and others registered in the Defense Enrollment Eligibility Reporting System (DEERS). http://www.Tricare.mil/Welcome.aspx.

65) Tricare operates through military hospitals and clinics worldwide and is supplemented through contracts with civilian healthcare providers. Tricare is a triple-option benefit program designed to give beneficiaries a choice among health maintenance organizations,

preferred provider organizations, and fee-for-service benefits. Five managed care contractors create networks of civilian healthcare providers.

66) CHAMPVA, administered by the Department of Veterans Affairs, provides healthcare coverage to qualified families of deceased or disabled veterans.

67) Tricare covers treatments that are "medically necessary and considered proven," in other words, not experimental, and safe and effective. http://www.Tricare.mil/CoveredServices/Pharmacy.aspx. Tricare specifically excludes benefits that are unproven or experimental, or specifically excluded by statutes, regulations or policies.

68) Tricare screens the ingredients that comprise compound drugs to make sure Tricare covers those ingredients, they are safe and effective, and are medically necessary. http://www.Tricare.mil/CoveredServices/Pharmacy/Drugs/CompoundDrugs.aspx

69) Tricare defines "medical necessity" as "whether, from a medical point of view, the care is appropriate, reasonable, and adequate for the condition." Tricare Appeals Fact Sheet, August 2015, at 2; and http://www.Tricare.mil/Resources/Appeals/MedicalNecessity.aspx.

**FDA Restrictions on Marketing and Sale of Prescription Drugs.**

70) The FDA restricts representations that tele-marketers can make to prospective patients about the drug's efficacy or safety. In 1969, the agency issued final regulations for prescription drug advertising, which stipulated that these ads must (1) not be false or misleading, (2) present a "fair balance" of information describing both the risks and benefits of a drug, (3) include facts that are "material" to the product's advertised uses, and (4) include a "brief summary" that mentions every risk described in the product's labeling. Direct to Consumer Pharmaceutical Advertising, Pharmacy & Therapeutics Journal, http://www.ncbi.nlm.nih.gov/pmc/articles/PMC3278148/#b17-ptj3610669, citing Boden WE,

Diamond GA. DTCA for PTCA: Crossing the line in consumer health education? N Engl J Med. 2008;358(21):2197–2200; and PhRMA Guiding Principles Direct to Consumer Advertisements About Prescription Medicines, http://www.phrma.org/sites/default/files/pdf/phrmaguidingprinciplesdec08final.pdf.

71) The Federal Food Drug and Cosmetic Act, 21 U.S.C. §301 et seq. ("FDCA"), provides that a prescription drug cannot be sold in interstate commerce unless it is approved by the FDA for the specific medical use, or "indication", list on the drug's labeling. See 21 U.S.C. §355(a) and (d). The FDCA generally prohibits manufacturers from introducing a drug into interstate commerce with an intent that it be used for an off-label purpose, or by "misbranding" it by including information about unapproved uses on its label. Such prohibition includes both directly advertising off-label uses through labeling claims or explicit statements made by sales representatives.

**Florida Statutes and Regulations.**

A. The Florida False Claims Act.

72) The Florida False Claims Act provides in pertinent part:

(2) Any person who:

> (a) knowingly presents or causes to be presented to an officer or employee of an agency a false or fraudulent claim for payment or approval;
>
> (b) knowingly makes, uses, or causes to be made or used a false record or statement to get a false or fraudulent claim paid or approved by an agency;
> . . .
> (g) knowingly makes, uses, or causes to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to an agency,

is liable to the state for a civil penalty of not less than $5,500 and not more than $11,000 and for treble the amount of damages the agency sustains because of the act or omission of that person.

Florida False Claims Act §§ 68.082 (2)(a), (b), (g).

73) Like the FCA, under the Florida False Claims Act, the term "knowingly" means that a person "(1) [h]as actual knowledge of the information; (2) [a]cts in deliberate ignorance of the truth or falsity of the information; or (3) [a]cts in reckless disregard of the truth or falsity of the information." *Id.*, § 68.082(1)(c). No proof of specific intent to defraud is required. *Id.*

74) The Florida False Claims Act also broadly defines a "claim" as "any written or electronically submitted request or demand, under a contract or otherwise, for money, property, or services, which is made to any employee, officer, or agent of an agency, or to any contractor, grantee, or other recipient if the agency provides any portion of the money or property requested or demanded, or if the agency will reimburse the contractor, grantee, or other recipient for any portion of the money or property requested or demanded." *Id.*, § 68.082(1)(b). "Agency" is defined as any "official, officer, commission, board, authority, council, committee, or department of the executive branch of state government." *Id.*, § 68.082(1)(a).

75) The Florida False Claims Act also empowers private persons having information regarding a false or fraudulent claim against the Government to bring an action on behalf of the Government and to share in any recovery. *See Id.*, §§ 68.083(2), 68.085.

76) Additional Florida laws apply in this case. Florida Statute precludes the dissemination of any false or misleading advertisement of a drug (Fla. Stat. §499.005(5)), as well as any representation or suggestion that an application of the drug is effective when it is not, or that the drug complies with the statute when it does not (Fla. Stat. §499.005(11)).

77) Both the Pain Cream and the Skin Cream contain drugs recognized in the current edition of the United States Pharmacopoiea and National Formulary, and are thus considered drugs within Florida Statute. Fla. Stat. §499.003(12). Upon information and belief, other drugs

involved in the wrongful conduct are similarly recognized, and thus Defendants must comply with Florida Statute §499.005(11) as to those drugs as well.

78) Florida Administrative Code §64B8-9.0141(1) provides that "[t]elemedicine shall not include the provision of health care services only through an audio only telephone, email messages, text messages, facsimile transmission, U.S. Mail or other parcel service or any combination thereof." In other words, telemedicine may only be provided in conjunction with in-person physician care.

**THE FRAUDULENT SCHEME**

79) Defendants use an aggressive marketing strategy to target the elderly and United States Veterans as patients for Defendants' multi-level kickback scheme, designed to obtain reimbursement for one or more creams from the DermaSilkRx Product Line and Non-DermaSilkRx Pain and Skin Creams, at enormous profit, in direct violation of federal and Florida law. The Defendants work in concert to implement their scheme, which is as follows: a tele-marketing call center (often a division of, or intertwined with, Defendant Distributor and Marketer, Defendant Phusion MG, and Defendants Thomas and Slagle, or, alternatively, the Stapleton Entities) obtains the names of prospective "patients" – usually veterans or senior citizens – from a leads supplier or existing call lists, often obtained from Defendant Phusion MG or through the Stapleton Entities. The tele-marketers contact these prospective "patients", using a script that Erik Santos (by whom Relators were first introduced to the fraudulent methodology permeating the compounding pharmaceutical pain cream industry) provided, which Thomas and others adopted for their own use. The telemarketers inquire as to whether the "patients" are experiencing pain or have scars. If the "patients" answer yes, the tele-marketer (not medically trained) informs the "patient" of one or more of the DermaSilkRx Product Line or other pain or

skin cream products. The tele-marketer does not provide the "patient" with the FDA-required information, as set forth above, and makes representations regarding the Pain Creams and/or Skin Cream's efficacy and safety, in violation of both federal and Florida law. The telemarketer then informs the "patient" that one of their "network physicians" will approve the medication, and one of their "network pharmacies" will then send the patient a "30 day supply of the transdermal pain cream." The telemarketer then takes the patient through a questionnaire ["opt in survey"] with the patient, asking for identifying facts, and body parts in which they are experiencing pain. The tele-marketer informs the "patient" that the "medical team" will contact the patient within the hour to triage the patient if the patient qualifies. The triage person ("Triage") (again, not medically trained and typically within the same facility as the initial telemarketer), contacts the "patient" and asks the "patient" some questions and obtains the patient's insurance information and a contact telephone number. Triage advises the "patient" that a medical doctor will call him or her and confirm the need for one or more of the DermaSilkRx Product Line products or other Defendant pain and scar creams, and advises the "patient" of the process for obtaining the products. Triage provides the "patient's" contact number and insurance information to a telephonic physician ("tele-med physician"). Defendant Distributor and Marketer and Defendant Mclinician have a network of hundreds of such tele-med physicians under contract. The Defendants, including, but not limited to, Mclinician, coordinate and, in many cases, originate the call between the "patient" and the tele-med physician. The tele-med physician, often located in India, speaks to the "patient" on the telephone, usually for somewhere between 3 and 5 minutes, during which time the doctor reconfirms the pain and insurance information. This consultation is at no cost to the patient. Following the telephone call, the telemed doctor prescribes the "patient" one or more of the DermaSilkRx Product Line

products or Non-DermaSilkRx Pain and Scar Creams. The physician does not see the "patient" in person. The physician does not charge the "patient" for the consult. Following the telephone call, the physician sends the prescription to a pharmacy to fill and adjudicate. The tele-med physician's patient contact ceases at this point. A majority if not all of the pharmacies filling the prescriptions for the DermaSilkRx Products and the non-DermaSilkRx Pain and Scar Creams are all linked with Defendant Phusion Rx, Defendant Florida Pharmacy Solutions, or Defendant Direct Pharmacy Services (Defendant "Pharmacies"). Defendant Hughes handles the pharmacy adjudication of the DermaSilkRx pain and scar creams. All of the DermaSilkRx Product Line and Non-DermaSilkRx prescriptions are largely, if not entirely, filled by mail order. The patient's only interaction on the transaction is with the telemarketers and the postal service employee.

80) The Defendant Distributor and Marketer boasts a 100% manufacturer's copay rebate (the "copay rebate"). The motivation of the copay rebate is to minimize patient abandonment of prescriptions. Upon information and belief, the Defendant Pharmacies do not collect a copayment from the patient. The Defendant Pharmacies bill TRICARE, Medicare or Medicaid an exorbitant inflated amount (which Defendant Manufacturer establishes) for the prescription, which the Government agency then pays to the Defendant Pharmacies. Once the Defendant Pharmacies receive payment from the government entity, the Defendant Pharmacies typically retain 50% of the payment, and distribute the balance to the telemarketing company, the tele-med group (most often, Defendant Mclinician), and to the Defendant Manufacturer.

81) Express Scripts is the TRICARE pharmacy contractor. http://www.Tricare.mil/CoveredServices/Pharmacy.aspx. Defendant Slagle negotiated with

Express Scripts to secure a preference level 2 for the DermasilkRx Product Line products, thereby easing the prescription approval process with regard to TRICARE.

82) Defendants are manufacturing, marketing and distributing a drug, and are obligated to observe federal and Florida laws and regulations regarding same.

83) The Defendant Distributor and Marketer, Mclinician and/or Defendant Pharmacies pay the telephonic physicians a flat fee of $80 or $100 per "patient." This constitutes a kickback, as set forth herein.

84) Defendants bill the DermaSilkRxSkin Cream at a rate of $5,129.35 per month. The cost to the pharmacy ordering through Defendant Distributor and Marketer is $1275.00. Defendants bill the Pain Creams at a rate of $3600-$3605 per month. The cost to the pharmacy ordering through Defendant Distributor and Marketer is $1244.00.

85) This scheme has resulted in and will continue to result in Defendants submitting or causing the submission of false claims to the United States Government. Had the United States known of the false submissions it would have not reimbursed Defendants.

86) Defendants' scheme also harms Part D beneficiaries by forcing them to enter "gap coverage" or the "donut hole," necessitating accelerated payment for prescriptions out of their own pockets.

87) The scheme also further harms the United States because it causes Part D beneficiaries to enter into catastrophe coverage earlier than they would have or at all. Once they enter into catastrophe coverage, the United States is responsible for footing the bill for the prescriptions.

88) Moreover, the Government, through TRICARE, was fraudulently induced to pay the inflated prices for Veterans' prescriptions for the DermaSilkRx Product Line products and

others. Claims files concerning TRICARE beneficiaries support such allegations. Had the United States known of these false submissions, it would have not reimbursed Defendants.

**Defendant's Anti-Kickback Violations.**

89) Defendant Distributor and Marketer utilize Defendant Mclinician tele-med physicians to conduct telephonic "consultations" of the "patients" whom Defendant Distributor and Marketer and others obtained through their telemarketer call centers. The flat fee Defendants pay these tele-med physicians constitutes an illegal kickback. The Stapleton Defendants engage in a similar scheme.

90) The "patients" do not pay the telemedicine physicians for the consultations, constituting another illegal kickback.

91) Further, Defendant Distributor and Marketer offer an "automatic copay rebate", in part, to help reduce prescription abandonment. Such rebate constitutes an illegal kickback.

92) Defendant Manufacturers and Defendant Pharmacies, had and have actual knowledge of Defendant Distributor and Marketer and Defendant Mclinician's tactics, or acted in deliberate ignorance of those tactics, or with reckless disregard of those tactics.

93) Defendant Distributor and Marketer had and have actual knowledge that its tactics are illegal, or acted in deliberate ignorance or with reckless disregard of the illegality of those tactics.

94) These illegal kickbacks violate the Anti-kickback Statute, 42 U.S.C. § 1320a-7b(b) and amount to violations of the FCA. Defendants impliedly and/or expressly certified compliance with the Anti-Kickback Statute, which is a condition of payment. Had the United States known of these false submissions, it would have not reimbursed Defendants.

95) This scheme further resulted in Defendants submitting or causing the submission of false claims to the United States though the Medicare Part D Program, and charging inflated

prices to the United States. Had the United States known of these false submissions, it would have not reimbursed Defendants.

**Wrongful Tele-Marketing and Prescribing of Drug.**

96) The non-medical telemarketers made representations about the DermaSilkRx Product Line (and other) products' safety and efficacy. They are not medically trained to make such representations, and those representations violate federal and Florida law.

97) The non-medical "Triage" staff also made representations about the DermaSilkRx Product Line's (and others) safety and efficacy. They are not medically trained to make such representations, and those representations violate federal and Florida law.

98) This scheme further resulted in Defendants submitting or causing the submission of false claims, and conspiring to submit false claims, to the United States though the Medicare Part D Program, and charging inflated prices to the United States. Had the United States known of these false submissions, it would have not reimbursed Defendants.

99) Moreover, the tele-med physicians are prescribing the DermaSilkRx Product Line and non-DermaSilkRx Products in enormous numbers without ever seeing and evaluating the patients in person. Such prescriptions were neither medically necessary nor prescribed for medically accepted indication. Therefore, such prescriptions violate federal and Florida law and are false claims.

100) Such prescriptions also violate Florida Administrative Code §64B8-9.0141(1) regarding the practice of telemedicine.

101) This scheme further resulted in Defendants submitting or causing the submission of false claims to the United States though Medicare, TRICARE, and Medicaid, charging

inflated prices to the United States. Had the United States known of these false submissions, it would have not reimbursed Defendants.

**Applying the Law to the Facts.**

102) Defendants' conduct supporting the FCA allegations is as follows. Defendants improperly procure "patients" through telemarketing call centers, preying on the elderly and veterans. The call centers, often the Defendants or those related to Defendants, improperly and illegally describe the benefits of the DermaSilRx Product Line products, and non-DermaSilkRx Products, by misrepresenting the safety and efficacy of those drugs. Telemedicine doctors (often part of one or more of the Defendants' networks), paid by Defendants, thereafter improperly contact the "patients" (again through one or more of the Defendant companies, including, but not limited to, Defendant Mclinician) and prescribe the DermaSilkRx products and non-DermaSilkRx Products to the "patients" without an in-person consultation or a determination of medical necessity. The tele-med physicians then send the prescription to the pharmacy, often Defendant Pharmacies, for filling and adjudication. The Defendants do not require the "patients" to pay any copay. The Defendant Pharmacies seek reimbursement from the Government entity for the full amount of the drug, not the actual charge based on the lack of payment of the copay. Upon receipt of reimbursement, the Defendant Pharmacies typically retain 50% of the payment, and distribute the remaining payment to the Defendant Manufacturer, the Defendant Telemarketers, and Defendant Mclinician (or whatever other tele-med physician entity Defendants use to have the drug prescribed).

**Kickbacks.**

103) Defendant Distributor and Marketer, Defendant Pharmacies, and others, pay a flat fee to the telemedicine physicians for every patient they contacted via the leads the Defendant

Telemarketers obtained and provided to them. Those telemedicine physicians then prescribed the DermaSilkRx Products (and Non-DermaSilkRx Products), and sent the prescription to the Defendant Pharmacies and other pharmacies to be filled. Such fee constitutes an illegal kickback.

104) Defendant Distributor and Marketer, Defendant Pharmacies, and others devised a scheme whereby the telemedicine physician did not charge the newly identified "patients" a consultation fee. Such constitutes an illegal kickback.

105) Defendant Distributor and Marketer, and others, boasted covering 100% of the monthly copay, up to $100.00. Such copay rebate fits squarely within the definition of wrongful "remuneration" and thus constitutes an illegal kickback.

**Drugs were not Medically Necessary**.

106) The DermasilkRx Product Line and Non-DermaSilkRx Products fail to meet the Medicare definition of "medically necessary." The prescription of these medically unnecessary drugs constitutes fraud.

107) The DermasilkRx Product Line and Non-DermaSilkRx Products fail to meet the TRICARE definition of "medically necessary." The prescription of these medically unnecessary drugs constitutes fraud.

108) The DermasilkRx Product Line and Non-DermaSilkRx Products fail to meet the Medicaid definition of "medically necessary." The prescription of these medically unnecessary drugs constitutes fraud.

**Violations of Federal and Florida Law.**

109) The wrongful marketing of the drugs and illegal use of telemedicine, in violation of federal and Florida law, further render the claims false. Defendant Manufacturer, through its

sales representatives (here, both Defendant Distributor and Marketer and the telemarketers they hired), as well as the Stapleton Entities, wrongfully marketed the drugs through their cold call techniques, described herein.

110) In job listings for telemedicine physicians, Defendant Mclinician boasts that each telephonic "appointment" with the "patient" typically takes 3-5 minutes. *See, e.g.*, http://jobs.climber.com/jobs/Healthcare-Medical/Newark-NJ-07101-USA/Telemedicine-Physician-Only-Physicians-May-Apply/124221901. Moreover, this is typically the only "visit" the patient receives from the doctor. The failure of the telemedicine physicians to ever see the patients in person, in violation of Florida law, further demonstrates the falsity of Defendants' claims.

**Violations of the False Claims Act**
**(31 U.S.C. § 3729(a)(1)(A))**
**Presenting False Claims for Payment**

111) Plaintiff re-alleges and incorporates by reference herein the allegations contained in paragraphs 1 through 110, above.

112) The United States seeks relief against Defendants under the False Claims Act, 31 U.S.C. § 3729(a)(1)(A).

113) As set forth above, from 2015 to the present, Defendants either themselves, or in concert with other Defendants, authorized, reviewed, approved, caused the filing of, and/or failed to rectify reimbursement claims made to the Medicare, TRICARE, Medicaid Programs and other federal health care programs. Defendants' actions during each stage of the process rendered the claims false.

114) Defendants then submitted the claims to Medicare, TRICARE, Medicaid, and other government healthcare programs, certifying that the claims for reimbursement they

submitted were truthful, correct, and that the claims identified services that were billed in compliance with the law.

115) Defendants acted knowingly, with deliberate ignorance, or with reckless disregard for the truth in presenting, or causing to be presented, to an officer, employee, or agent of the United States, false and fraudulent claims for payment or approval in connection with the submission of its requests for reimbursement under the Medicare, TRICARE, Medicaid and other federal healthcare programs.

116) As a result of the false certifications submitted, Defendants obtained payments from the United States and the State of Florida for medically unnecessary or unindicated drugs, the prescriptions for which Defendants procured by illegal means, including improper marketing and sales tactics, telemedicine physicians, and Medicare Part D violations, and by paying illegal kickbacks to obtain the prescriptions for the DermaSilkRx products and others.

117) By reason of Defendants' false claims, the United States has been damaged in a substantial amount to be determined at trial.

**Violations of the False Claims Act**
**(31 U.S.C. § 3729(a)(1)(B))**
**Use of False Statements**

118) Plaintiff re-alleges and incorporates by reference herein the allegations contained in paragraphs 1 through 110, above.

119) The United States seeks relief against Defendants under the False Claims Act, 31 U.S.C. 3729(a)(1)(B).

120) As set forth above, from 2015 to the present, Defendants either themselves, or in concert with other Defendants, authorized, reviewed, approved, caused the filing of and/or failed to rectify claims for reimbursement to the Medicare, TRICARE and Medicaid Programs and other federal health care programs, which claims contained false records and/or statements.

Defendants then submitted the claims to Medicare, Medicaid, TRICARE and other government healthcare programs, certifying that the claims for reimbursement they submitted were truthful, correct, and that the claims identified services that were billed in compliance with the law.

121) As a result of the false certifications submitted, Defendants obtained payments from the United States and the State of Florida for medically unnecessary or unindicated drugs, the prescriptions for which Defendants procured by illegal means, including improper marketing and sales tactics, telemedicine physicians, and Medicare Part D violations, and by paying illegal kickbacks to obtain the prescriptions for the DermaSilkRx products and others.

122) Defendants acted knowingly, with deliberate ignorance, or with reckless disregard for the truth in making and using, or causing to be made and used, false records and statements, in order to get false or fraudulent claims paid or approved by the United States in connection with the submission of its requests for reimbursement under the Medicare, TRICARE, Medicaid and other federal healthcare programs.

123) As a result of Defendants' false statements, Defendants obtained payments from the United States and the State of Florida for medically unnecessary or unindicated drugs, the prescriptions for which Defendants procured by illegal means, including improper marketing and sales tactics, telemedicine physicians, and Medicare Part D violations, and by paying illegal kickbacks to obtain the prescriptions for the DermaSilkRx products and others.

124) By reason of Defendants' false claims, the United States has been damaged in a substantial amount to be determined at trial.

**Violations of the False Claims Act**
**(31 U.S.C. § 3729(a)(1)(C))**
**Conspiracy to Commit a Violation**

115) Plaintiff re-alleges and incorporates by reference herein the allegations contained in paragraphs 1 through 110, above.

116) The United States seeks relief against Defendants under the False Claims Act, 31 U.S.C. 3729(a)(1)(C).

117) As set forth above, from 2015 to the present, Defendants either themselves, or in concert with other Defendants, authorized, reviewed, approved, caused the filing of and/or failed to rectify claims for reimbursement to the Medicare, TRICARE and Medicaid Programs and other federal health care programs, which claims contained false records and/or statements. Defendants then submitted the claims to Medicare, Medicaid, TRICARE and other government healthcare programs, certifying that the claims for reimbursement they submitted were truthful, correct, and that the claims identified services that were billed in compliance with the law.

118) As a result of the false certifications submitted, Defendants obtained payments from the United States and the State of Florida for medically unnecessary or unindicated drugs, the prescriptions for which Defendants procured by illegal means, including improper marketing and sales tactics, telemedicine physicians, and Medicare Part D violations, and by paying illegal kickbacks to obtain the prescriptions for the DermaSilkRx products and others.

119) Defendants conspired to defraud the Government by getting false or fraudulent claims allowed or paid.

120) Defendants acted knowingly, with deliberate ignorance, or with reckless disregard for the truth in making and using, or causing to be made and used, false records and statements, in order to get false or fraudulent claims paid or approved by the United States in connection with the submission of its requests for reimbursement under the Medicare, TRICARE, Medicaid and other federal healthcare programs.

121) As a result of Defendants' false statements, Defendants obtained payments from the United States and the State of Florida for medically unnecessary or unindicated drugs, the prescriptions for which Defendants procured by illegal means, including improper marketing and sales tactics, telemedicine physicians, and Medicare Part D violations, and by paying illegal kickbacks to obtain the prescriptions for the DermaSilkRx products and others.

122) By reason of Defendants' false claims, the United States has been damaged in a substantial amount to be determined at trial.

**Violations of the False Claims Act**
**(31 U.S.C. § 3729(a)(1)(G))**
**Use of False Statements**

123) Plaintiff re-alleges and incorporates by reference herein the allegations contained in paragraphs 1 through 110, above.

124) The United States seeks relief against Defendants under the False Claims Act, 31 U.S.C. § 3729(a)(1)(G).

125) As set forth above, from 2015 to the present, Defendants either themselves, or in concert with other Defendants, authorized, reviewed, approved, caused the filing of and/or failed to rectify claims for reimbursement to the Medicare, TRICARE and Medicaid Programs and other federal health care programs, which claims contained false records and/or statements. Defendants then submitted the claims to Medicare, TRICARE, Medicaid, and other government healthcare programs, certifying that the claims for reimbursement they submitted were truthful, correct, and that the claims identified services that were billed in compliance with the law.

126) Defendants, knowingly or acting in deliberate ignorance or in reckless disregard for the truth, made, used, and caused to be made and used, false records and statements, in order to conceal, avoid, or decrease the obligation to pay or transmit money or property to the United

States in connection with the submission of its requests for reimbursement under the Medicare, Medicaid and other federal healthcare programs.

127) As a result of the false certifications submitted, Defendants obtained payments from the United States and the State of Florida for medically unnecessary or unindicated drugs, the prescriptions for which Defendants procured by illegal means, including improper marketing and sales tactics, telemedicine physicians, and Medicare Part D violations, and by paying illegal kickbacks to obtain the prescriptions for the DermaSilkRx products and others.

128) Defendants conspired to defraud the Government by getting false or fraudulent claims allowed or paid.

129) Defendants failed to pay or transmit money due to the United States because of its acts and conduct.

130) By reason of Defendants' false claims, the United States has been damaged in a substantial amount to be determined at trial.

**Violation of the Florida False Claims Act**
**(Fla. Stat. §§ 68.081 *et seq.)***

131) Plaintiff re-alleges and incorporates by reference herein the allegations contained in paragraphs 1 through 110, above.

132) This is a claim for treble damages and civil penalties under the Florida False Claims Act, Fla. Stat. §§ 68.081 *et seq*.

133) By virtue of the submissions of non-reimbursable claims described above, Defendants knowingly caused to be presented, or conspired to present, to an officer or employee of an agency false or fraudulent claims for the improper payment or approval of DermaSilkRx Product Line prescription drugs, and used false or fraudulent records to accomplish this purpose.

134) The State of Florida, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

135) By reason of these payments, the State of Florida has been damaged, and continues to be damaged in a substantial amount.

136) By reason of Defendants' acts and conduct, the State of Florida has been damaged in a substantial amount to be determined at trial.

WHEREFORE, Plaintiffs the United States *ex rel.* Gaile-Jean Noel and ASHER WILLIAMS, LLC, and the State of Florida *ex. rel.* Gaile-Jean Noel and ASHER WILLIAMS, LLC, request that judgment be entered in their favor and against Defendants as follows:

(i) On the First, Second, Third and Fourth Claims for relief (Violations of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A), (B), (C) and (G)), for treble the United States' damages, in an amount to be determined at trial, plus a $10,000 penalty (or the statutory amount in place at the time of determination of the penalty) for each false claim presented; awarding Gaile-Jean Noel and ASHER WILLIAMS, LLC their relator's share pursuant to 31 U.S.C. § 3730(d)(1) or (2); and an award of costs and attorney's fees pursuant to 31 U.S.C. § 3730(d);

(ii) On the Fifth Claim for relief (Violations of the Florida False Claims Act, Fla. Stat. §§ 68.081 *et seq.*), for treble the State of Florida's damages, in an amount to be determined at trial, plus a $11,000 penalty for each false claim; awarding Gaile-Jean Noel and ASHER WILLIAMS, LLC their relator's share pursuant to Florida False Claims Act § 68.081 *et seq.*; and an award of costs and attorney's fees pursuant to Florida False Claims Act § 68.081 *et seq.*; and

(iii) Awarding such further relief as is proper.

**JURY TRIAL IS DEMANDED**

Dated: Largo, Florida
May 11th, 2016

By: [signature]
Audrey Hildes Schechter
Law Offices of Audrey Hildes Schechter, P.A.
P.O. Box 445
Largo, Florida 33779
Telephone: 727-687-5530
audreyschechterlaw@gmail.com

*Attorneys for the United States of America and the State of Florida ex rel. Gaile-Jean Noel and Asher Williams, LLC*

TO:

United States Attorney
Attorney Charles Harden
Middle District of Florida
Civil Division
400 North Tampa Street
Suite 3200
Tampa, Florida 33602

Attorney General
Civil Division
Attorney Nathan Green
United States Department of Justice
950 Pennsylvania Avenue, NW
Washington, D.C. 20530-0001

Office of Attorney General
State of Florida
Attorney Erin Van De Walle
Medicaid Fraud Control Unit
The Capitol PL-01
Tallahassee, FL 32399-1050

Mr. Jeff Attwater
Chief Financial Officer
200 East Gaines Street
Tallahassee, FL
32399-0300